Chris J. Gallus
*Attorney for Plaintiff*
I.D. #4460
1423 Otter Road
Helena, MT  59602-7641
406.459.8676
chrisgalluslaw@gmail.com
galluslaw@gmail.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | | |
|---|---|---|
| NATHAN PIERCE; MONTANA COALITION FOR RIGHTS; GOOD NEIGHBORS FOR MONTANA; MONTANANS FOR CITIZEN VOTING; AND, SHERRI FERRELL, | : : : : : : | |
| Plaintiffs, | : : | **CIVIL ACTION** |
| v. | : : : | **6:18-cv-00063-CCL**<br>**Judge Charles C. Lovell** |
| COREY STAPLETON, in his official capacity as the Secretary of State for the State of Montana; AND, TIM FOX, in his official as the Attorney General of Montana, | : : : : : | |
| Defendants. | : : | *Filed Electronically* |

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR AN EMERGENCY TEMPORARY RESTRAINING ORDER OR EMERGENCY PRELIMINARY INJUNCTION

## **<u>TABLE OF CONTENTS</u>**

Table of Contents…………………………………………………………..……….2

Table of Authorities…………………………………………………….…..3

Background…………………………………………………………………6

Standard of Review……………………………………………………….…..12

Analysis……………………………………………………………………....14

    A.    Plaintiffs Are Likely To Succeed On the Merits
of their Claims……………………………………………………14

        1.    Plaintiffs Are Very Likely to Succeed on the Merits
Of the Claims that Section 13-27-102 (2)(a) of the
Montana Code is Unconstitutional…………………………...14

        2.    Plaintiffs Are Likely to Succeed on the Merits
Of the Claims that Section 13-27-102 (2)(b) of the
Montana Code is Unconstitutional…………………………...20

    B.    Plaintiffs Will Suffer Irreparable Injury of the Requested
Relief is Not Granted……………………………………………..25

    C.    Defendants Will Suffer No Injury…………………………...26

    D.    The Public Interest is Served By Issuing the Requested
Injunctions…………………………………………………...26

E.      No Security is Required…………………………………………....26

Conclusion……………………………………………………………...…27

Certificate of Compliance………………………………………...……………28

Certification of Service………………………………………………………28

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*All for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)……………………………………...…….13

*Buckley v. American Constitutional Law Foundation*,
    525 U.S. 182 (1999)…………………………………………………..14, 15, 18

*Chandler v. City of Arvada*,
    292 F.3d 1236 (10th. Cir. 2002)………………………….…………….18

*Citizens for Tax Reform v. Deters*,
    518 F.3d 375 (6th Cir. 2008)……………………………………..……….21

*Citizens in Charge v. Gale*,
    810 F.Supp.2d 916 (D. Neb. 2011)……………………………..…………15

*Cottonwood Envtl. L. Ctr. V. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015)……………………………….…....….13

*Daien v. Ysursa*,
    711 F.Supp.2d 1215 (D. Idaho 2010)…………………………..…………16

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014)……………………………….……….…..13

*Elron v. Burns*,
    427 U.S. 347 (1976)…………………………………………....…....13, 25

*Goodall v. Williams*,

2018 WL 2035998  (D. Colo., May 1, 2018)………………………..……..17

*Green Party of Pennsylvania v. Aichele*,
    89 F.Supp3d 723 (E.D. Pa. 2015)……………………………………………16

*Independence Institute v. Gessler*,
    936 F.Supp. 1256 (10th Cir. 2013)………………………….…………..22, 23

*Krislov v. Rednour*,
    226 F.3d 851 (7th Cir. 2000)………………………………………………16

*Libertarian Party of Connecticut v. Merrill*,
    2016 WL 10405920 (D. Conn., January 26, 2016)………………………...17

*Libertarian Party of Virginia v. Judd*,
    718 F.3d 308 (4th Cir. 2013)……………………………………….…16

*Meyer v. Grant*,
    486 U.S. 414 (1988)……………………………………………..……..15, 19

*Nader v. Blackwell*,
    545 F.3d 459 (6th Cir. 2008)……………………………….………………15

*Nader v. Brewer*,
    531 F.3d 1028 (9th Cir. 2008)……………………………..……16, 17, 18

*Nken v. Holder*,
    556 U.S. 418 (2009)……………………………………………….……13

*Prete v. Bradbury*,
    438 F.3d 949 (9th Cir 2006)……………………………..………….21

*Wilmoth v. Merrill*,
    2016 WL 829866 (D. Conn., March 1, 2016)………………..……..17

*Wilmoth v. Sec'y of State of New Jersey*,
    2018 WL 1876021, at 3-6 (3rd Cir. 2018)……………………………17

*Winter v. Nat. Resources Def. Council, Inc.*,
    555 U.S. 7 (2008)………………………………………..…………12, 13

*Yes on Term Limits v. Savage*,
    550 F.3d 1023 (10th Cir. 2008)……………………………………..…….22

## Statutes & Rules

FED. R. CIV. P. 65(c)…………………………………………………..…….26

Mont. Code. Ann. §13-27-102 (2)(a)…………………………………..…….*passim*

Mont. Code. Ann. §13-27-102 (2)(a)…………………………………..…….*passim*

## Other Authority

C. WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE
    § 2954………………………………………………………………..….26

## I.    **BACKGROUND**

Section 13-27-102 (2)(a) of the Montana Code requires that only residents of

Montana may lawfully circulate initiative petitions seeking to place proposed

amendments to Montana's state constitution on the general election ballot for the

consideration and approval of Montana's voters.  Compl. ¶25, pp. 12-13.  Section

13-27-102 (2)(b) of the Montana Code, in turn, prohibits sponsors of initiatives to

amend the state constitution to compensate signature gatherers based on the

number of signatures gathered.  Compl. ¶25, pp. 12-13. Plaintiffs challenge each of

the foregoing provisions as violating rights guaranteed to them under the First and

Fourteenth Amendments to the United States Constitution.  *See*, Compl. Counts I –

VI, pp. 18-30.  Plaintiffs request in their current motion emergency temporary and

preliminary injunctive relief barring Defendants from enforcing the challenged

provisions against them until this action can be decided on the merits.

Plaintiffs Nathan Pierce, Montana Coalition for Rights, Good Neighbors for

Montana and Montanans for Citizen Voting are circulating or intend to circulate

initiative petitions to place proposed amendments to the Montana state constitution

on the 2018 general election ballot for the consideration and approval of

Montana's voters. *See,* Compl. ¶¶12-15, pp. 4-9.  Plaintiffs Nathan Pierce,

Montana Coalition for Rights, Good Neighbors for Montana and Montanans for

Citizen Voting need to collect and file 50.936 valid signatures of registered

Montana voters on or before June 22, 2018 with Defendant Stapleton.  Compl. ¶21, pp. 11-12.  Plaintiffs Nathan Pierce, Montana Coalition for Rights and Montanans for Citizen Voting represent to this Court in their declarations that in the event that they do not succeed in placing their initiative on the 2018 general election ballot, they will seek to do so again for the 2020 general election.  *See,* ¶6, First Declaration of Nathan Pierce; ¶6 First Declaration of Nels Swandal.

Plaintiffs Nathan Pierce, Montana Coalition for Rights and Montanans for Citizen Voting testify that there are not enough professional circulators who are resident of Montana to allow them to gather the required number of signatures to place their proposed constitutional amendments on the 2018 general election ballot.  *See*, First Declaration of Nathan Pierce, ¶7; First Declaration of Nels Swandal, ¶7.  Plaintiffs Nathan Pierce, Montana Coalition for Rights and Montanans for Citizen Voting testify that Plaintiff Sherri Ferrell, a resident of the State of Florida, along with many other out-of-state professional circulators to circulate their petitions their proposed amendments on the 2018 general election ballot but cannot do so as a direct and proximate result of Section 13-27-102 (2)(a) of the Montana Code which expressly prohibits anyone other than a resident of the State of Montana to gather signatures on initiative petitions seeking to amend Montana's state constitution.  *See*, First Declaration of Nathan Pierce, ¶8; First Declaration of Nels Swandal, ¶8.

Plaintiffs Pierce, Montana Coalition for Rights and Montanans for Citizen Voting further testify that professional circulators have developed unique skill sets, such as special strategies to move through crowds, circulating and maintaining eye contact and answering voter's question on multiple petition clipboards that volunteer and untrained individuals cannot develop within the short time period that Plaintiffs are permitted to circulate their initiative petition in Montana and have developed the ability to immediately and effectively circulate petitions without suffering from shyness, the inability to clearly articulate the purpose of the proposed initiative or lack of knowledge as to the rules and laws that govern the circulation of initiative petitions and the requirements of gathering a valid signature, because professional circulators who earn a living circulating petitions have, typically, circulated many dozens of petitions in other states who enforce laws similar to the laws in force in Montana governing the circulation of initiative and referendum petitions and the requirements for gathering a valid signature. *See*, First Declaration of Nathan Pierce, ¶¶ 9-10; First Declaration of Nels Swandal, ¶¶ 9-10.

Plaintiffs further contend that hiring professional circulators is the most cost effective method to gather the required number of signatures in a short period of time because professional circulators do not need extensive training like volunteer and non-professional circulators, are able to accurately and quickly communicate

with otherwise willing signers of Plaintiffs' initiative petition the purpose of the proposed amendment, thereby providing Montana's registered voters with high quality information on the proposed constitutional amendment, while, at the same time, complying with the rules and laws governing the circulation of initiative petition in Montana. *See*, First Declaration of Nathan Pierce, ¶11; First Declaration of Nels Swandal, ¶11. Plaintiffs also assert that because professional circulators earn a living circulating initiative, referendum and candidate petitions, professional circulators have a personal economic interest in their reputation for lawful signature gathering providing Plaintiffs an important additional bulwark against the threat of petition fraud in the field and lower the cost to Plaintiffs of signature verification because professional circulators have a track record of gathering a higher percentage of valid signatures from registered voters than volunteer and non-professional circulators because professional circulators have the skill set to ask the correct questions to screen-out unregistered voters and are not shy in refusing unregistered voters from signing the petition. Volunteers and non-professional circulators who are not accustomed with engaging in interactive communication with strangers may be shy in telling someone who wants to sign the petition that they cannot do so, it is a level of confrontation that only professional circulators are able to handle with skill and poise. *See*, First Declaration of Nathan Pierce, ¶12; First Declaration of Nels Swandal, ¶12. In sum,

Plaintiffs Pierce, Montana Coalition for Rights and Montanans for Citizen Voting testify that the ability to hire non-resident professional circulators will permit them to hire a larger number of efficient circulators which will permit them to reach more Montana voters in a larger number of geographic regions of Montana thereby increasing both the quantity and quality of speech afforded to Montana voters to permit them to exercise their own rights guaranteed under the First Amendment to the United States Constitution to engage in "core political speech" in the act of signing or not signing an initiative petition.  *See*, First Declaration of Nathan Pierce, ¶13; First Declaration of Nels Swandal, ¶13.

In concert with their challenge to the in-state residency requirement imposed under Section 13-27-102 (2)(a) of the Montana Code, Plaintiffs' challenge to the prohibition of compensation based on the number of valid signatures collected by signature gatherers contained in Section 13-27-102 (2)(b) of the Montana Code.  In support, Plaintiffs Pierce, Montana Coalition for Rights and Montanans for Citizen Voting testify that they would like to compensate signature gathers for their initiative petition on a per valid signature basis because professional out-of-state circulators, who are needed to gather the required number of valid signatures will not agree to travel to Montana to work for compensation on a per-hour basis because they are able to generate more income from petition drives in other states that permit compensation on a per valid signature basis because their unique skills

permit them to collect large numbers of valid signatures in short periods of time which generate more income than they can earn if their income is limited on a per hour basis.  *See*, First Declaration of Nathan Pierce, ¶15; First Declaration of Nels Swandal, ¶15.  These Plaintiffs testify that they have determined that compensation on a per valid signature basis will help ensure that only valid signatures are sought to be collected by the signature gatherers and that the economic incentive is limited to collecting valid signatures while at the same time incentivizing signature gathers to work as hard as possible to collect as many valid signatures in as short a period of time as possible. *See*, First Declaration of Nathan Pierce, ¶16; First Declaration of Nels Swandal, ¶16.

Plaintiffs testify that they have also determined that compensation of signature gatherers on a per valid signature basis will lower costs of the signature drive because Plaintiffs will not need to hire additional supervisors to make sure circulators who are only working on a per hour basis are working hard and not shirking their job by collecting as few signatures as possible to avoid being fired. *See*, First Declaration of Nathan Pierce, ¶17; First Declaration of Nels Swandal, ¶17.  Plaintiffs Pierce, Montana Coalition for Rights and Montanans for Citizen Voting also assert that a per valid signature compensation structure will also decrease the number of signature gatherers that need to be fired for poor work habits thereby increasing the efficiency of the signature drive and decreasing the

costs associated with training and supervising new signature gathers who would need to be trained to replace circulators fired for poor work habits. *See*, First Declaration of Nathan Pierce, ¶18; First Declaration of Nels Swandal, ¶¶18-19.

As part of the requested relief, Plaintiffs also request that Defendant Stapleton be ordered to accept any timely filed petition that strikes the offending text in the "Instructions for Signature Gatherers" so that the lawfulness of non-Montana residents circulating initiative petitions and per valid signature compensation is clear.

## II.   <u>STANDARD OF REVIEW</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal citation omitted). Generally, a party seeking a preliminary injunction must establish that: (1) the party is likely to succeed on the merits of the underlying claims; (2) the party is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tip in favor of granting the preliminary relief; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20 (internal citations omitted).

However, "serious questions going to the merits and a balance of hardships that tip[] sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of

irreparable injury and that the injunction is in the public interest." *All for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). The Ninth Circuit has established that when the government is a party under a preliminary injunction analysis, the public interest and balance of equities factors merge, rendering a three party instead of a four part analysis. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Furthermore, the Ninth Circuit has explained that establishing a likelihood of irreparable harm "should not be an onerous task for plaintiffs." *Cottonwood Envtl. L. Ctr. V. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015). Indeed, the United States Supreme Court has clearly established that: "The loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elron v. Burns*, 427 U.S. 347, 353 (1976). Thus in the context of an alleged violation of First Amendment rights, Plaintiffs' claimed  irreparable harm is "inseparably linked" to the likelihood of success on the merits of Plaintiffs' First Amendment claims. *Winter* 555 at 7 (2008). Thus, the central analysis for the award of preliminary injunctive relief for First Amendment claims is centered on the "likelihood of success on the merits" prong of the test.

## III.   <u>ANALYSIS</u>

### A.   <u>Plaintiffs Are Likely to Succeed On the Merits of their Claims</u>.

1.   Plaintiffs Are Very Likely to Succeed on the Merits of the Claims that Section 13-27-102 (2)(a) of the Montana Code is <u>Unconstitutional</u>.

There now exists wide consensus among federal district and circuit courts of appeal that in-state residency requirements for the circulation of initiative, referendum and candidate petitions are unconstitutional.  Restrictions which decrease the number of available message carriers imposes a severe restriction on "core" First Amendment speech and such restrictions are subject to strict scrutiny analysis and can only survive if the state demonstrates that the residency requirement is narrowly tailored to advance a compelling governmental interest. Every court to have considered this issue – including the Ninth Circuit – has held that the state's only legitimate interest in making sure that circulators are available for any investigation and/or prosecution of allegations of petition fraud are more narrowly advanced by requiring the out-of-state circulator to consent to the state's jurisdiction as a condition precedent to being allowed to circulate petitions in their state.

In evaluating ballot access cases, courts must "be vigilant . . . to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182, 192 (1999).

The Supreme Court has twice considered statutes that restrict who may circulate election petitions in support of ballot access, and has twice invalidated the restriction.    In *Meyer v. Grant*, 486 U.S. 414 (1988), the Court struck down Colorado's prohibition on paid petition circulators.  Holding that the restriction was "a limitation on political expression subject to exacting scrutiny" the Court reasoned that the state had failed to justify the burden on advocates' free speech rights.  *Meyer*, 486 U.S. at 420.  In *Buckley*, the Court invalidated a requirement that petition circulators be registered voters of the state, holding that the "requirement cuts down the number of message carriers in the ballot-access arena without impelling cause."  *Buckley*, 525 U.S. at 197.

Although *Buckley* expressly reserved the question of whether residency requirements like the one at issue in this action would be unconstitutional, *Buckley*, 525 U.S. at 197, every federal court to address in-state circulator restriction, where the circulators are willing to place themselves under the jurisdiction of the state in which they want to circulate election petitions has expressly relied on *Buckley* and *Meyer* to hold such requirements unconstitutional in the context of both ballot initiative and candidacy petitions.  *See Citizens in Charge v. Gale*, 810 F.Supp.2d 916 (D. Neb. 2011) (invalidating state residency requirement for circulators of candidacy and ballot initiative petitions); *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008) (invalidating state residency requirement for circulators of presidential

candidacy petitions); *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008) (same);

*Daien v. Ysursa*, 711 F.Supp.2d 1215 (D. Idaho 2010) (same); *Krislov v. Rednour*,

226 F.3d 851 (7th Cir. 2000) (invalidating residency requirement for circulators of

petition for congressional candidacy petitions); *Libertarian Party of Virginia v.*

*Judd*, 718 F.3d 308 (4th Cir. 2013) (invalidating state residency requirement for

circulators of candidacy petitions).

 The modern trend continues, in 2015, Judge Dalzell of the United States

District Court for the Eastern District of Pennsylvania preliminarily and

permanently enjoined enforcement of the in-state witness restriction imposed upon

the circulation of nomination papers pursuant to 25 P.S. 2911(d), as applied to

candidates for the Green and Libertarian parties of Pennsylvania.  *Green Party of*

*Pennsylvania v. Aichele*, 89 F.Supp3d 723 (E.D. Pa. 2015).  Judge Hall of the

United States District Court for the District of Connecticut enjoined the in-state

witness restriction on the circulation of nomination petitions for candidates for

both major and minor political parties.  *Wilmoth v. Merrill*, 2016 WL 829866 (D.

Conn., March 1, 2016); *Libertarian Party of Connecticut v. Merrill*, 2016 WL

10405920 (D. Conn., January 26, 2016).   Last month, the Third Circuit reversed

and remanded dismissal of a complaint challenging the constitutionality of New

Jersey's  in-state witness restriction for major political party candidates instructing

the district court to apply strict scrutiny analysis.  The Third Circuit rejected the

novel arguments accepted by the district court that the in-state residency and voter registration required advanced the state's interest in protecting the associational rights of political parties against "party raiding" at the level of petition circulating. *Wilmoth v. Sec'y of State of New Jersey*, 2018 WL 1876021, at 3-6 (3rd Cir. 2018) (applying strict scrutiny in light of general 'consensus' among circuits that 'laws imposing residency restrictions upon circulators are subject to strict scrutiny analysis). Just this month, Judge Philip A. Brimmer of the United States District Court for the District of Colorado issued a preliminary injunction barring the removal of Republican Congressman Douglas Lamborn from the primary ballot for gathering otherwise valid signatures using out-of-state circulators in violation of Colorado's in-state circulator requirement. In his decision granting a preliminary injunction Judge Brimmer stated: "The Third, Fourth, and Tenth Circuits have all reached the conclusion that strict scrutiny applies to circulator residency requirements without relying on any record evidence regarding the burdens that such requirements impose on First Amendment rights." *See Goodall v. Williams*, 2018 WL 2035998  (D. Colo., May 1, 2018).

The Ninth Circuit has similarly resolved the law in this Circuit on state residency requirements of petition circulators in *Nader v. Brewer*, 531 F.3d 1028 (2008). In *Nader v. Brewer*, the Ninth Circuit held that residency requirements for the circulation of election petitions severely excludes out-of-state supporters

speech and associational rights. *Nader* 531 F.3d at 1036. The Ninth Circuit properly applied strict scrutiny analysis to Arizona's residency requirement because, based on *Buckley*, state residency requirements significantly reduce the number of potential circulators imposing a severe burden on rights of political expression. *Id. see also*, *Chandler v. City of Arvada*, 292 F.3d 1236, 1238-39, 1241-42 (10th. Cir. 2002) (holding that strict scrutiny must be employed where the quantum of speech is limited due to restrictions placed upon the available pool of circulators or other supporters of a candidate or initiative).

Once strict scrutiny analysis is applied, Defendants cannot demonstrate that the state residency requirement of Section 13-27-102 (2)(a) is narrowly tailored to advance a compelling governmental interest. In *Nader*, the Ninth Circuit rejected residency requirements as narrowly advancing the state's interest in preventing fraud in the election process in making sure that circulators are subject to the state's subpoena power. The Ninth Circuit has already established that requiring circulators to submit, by agreement, to the jurisdiction of the state more narrowly advances the state's interest in preventing petition fraud and subjecting out-of-state circulators to the subpoena power of the state. *See Nader* 531 F.3d at 1037-38. Plaintiff Ferrell has expressly plead that she is willing, as a condition precedent to circulating initiative petitions in Montana, to submit to the state's jurisdiction "for purposes of any investigation related to the circulation, signing and/or filing of

18

initiative and referendum petitions that she circulates within the State of Montana."

*See* Compl. ¶16 at pp. 9-10.   Furthermore, the state can hardly even advance the

state interest of protecting against fraud as it does not seek to impose state

residency requirement for the circulation of most other election petitions in

Montana.

 Accordingly, Defendants cannot articulate any rational that the Montana's

residency requirement narrowly advances any compelling governmental interest.

Not only are Plaintiffs likely to prevail on their constitutional claims that Section

13-27-102 (2)(a) of the Montana Code impairs rights guaranteed to them under the

First and Fourteenth Amendments to the United States Constitution, it is virtually

black-letter law that such restrictions are unconstitutional and Plaintiffs will

*probably* prevail barring any last minute unexpected pronouncement from the

United States Supreme Court on this issue reversing the consensus among the

circuit courts that state residency requirements violate First Amendment

protections.

 Plaintiffs, therefore, respectfully submit that they are likely to prevail on

their claims that Section 13-27-102 (2)(a) is unconstitutional.

2.      Plaintiffs Are Likely to Succeed on the Merits of the
Claims that Section 13-27-102 (2)(b) of the Montana Code is
<u>Unconstitutional</u>.

As noted above, the United States Supreme Court has clearly established

that the right to pay petition circulators implicates "core political speech" which is

protected under the First Amendment to the United States Constitution.   In *Meyer*

*v. Grant*, 486 U.S. 414 (1988), the Court struck down Colorado's prohibition on

paid petition circulators.  Holding that the restriction was "a limitation on political

expression subject to exacting scrutiny" the Court reasoned that the state had failed

to justify the burden on advocates' free speech rights.  *Meyer*, 486 U.S. at 420.

The Court in *Meyer* determined that the ban on compensation to circulators

restricted political expression in two fundamental ways: (1) it limited the number

of voices who will convey the message and the size of the audience that can be

reached; and (2) the ban made it less likely that the initiative will garner the

number of signatures necessary to place the issue on the ballot.  *Id*. at 422-23.

Once the right to pay circulators for their efforts has been established, any

restriction on the way that compensation is structured is similarly subject to the

same "exacting scrutiny" that the Court employed to protect the underlying right.

As an initial consideration for the court, in other First Amendment contexts,

it is inconceivable that any federal court would uphold a state imposed ban on

compensating freelance journalists based on the number of words produced in their

articles (which is how many freelance journalists structure their compensation), just as it is equally unthinkable that a flat-out ban on payment to journalists for their work based on anything other than an hourly compensation scheme could survive any level of First Amendment scrutiny.  Likewise, the ban imposed by Montana on paying circulators based on the number of signatures gathered is clearly subject to "exacting" scrutiny under the First Amendment.

In fact, absolute and even partial bans on the ability to pay circulators based on the number of signatures gathered have been struck as unconstitutional infringements on First Amendment speech where there is record evidence showing the obvious, that such bans: (1) impair protected speech; and (2) do not narrowly advance any compelling governmental interest.  Only in cases where plaintiffs failed to establish sufficient evidence as to the severity of the burden imposed by per-signature compensation bans have they been upheld, including in the Ninth Circuit.  *See e.g., Prete v. Bradbury*, 438 F.3d 949 (9th Cir 2006).

In *Citizens for Tax Reform v. Deters*, 518 F.3d 375 (6th Cir. 2008), the court found that based upon the evidence presented at trial that: "There is little dispute that operating under a per-time-only system will increase the costs of both proposing an initiative and qualifying it for the ballot."  *Citizens for Tax Reform*, 518 F.3d at 383  The Court found that Ohio's prohibition on all other methods of payment except time worked was too restrictive.

In *Independence Institute v. Gessler*, 936 F.Supp. 1256 (10th Cir. 2013), the court struck down Colorado's partial ban on paying circulators based on the number of signatures gathered.  Section 1-40-112(4) of the Colorado Revised Statutes limited compensation based on the number of signatures gathered to 20% of the total compensation paid to circulators.  *Independence Institute*, 936 F.Supp. at 1259.  The Tenth Circuit held the ban was unconstitutional after evidence was produced that the partial ban on per signature compensation caused trained professional circulators to refuse to circulate in Colorado, thereby reducing the pool of persons available to circulate petitions triggering strict scrutiny analysis. *Independence Institute*, 936 F.Supp. at 1275-77.  The Court in *Independence Institute* reiterated that:

> Petition circulation….is core political speech, because it involves interactive communication concerning political change and consequently, First Amendment protection for this activity is at its zenith.  "Where the government restricts the overall quantum of speech available to the election or voting process…[such as] where the quantum of speech is limited due to restrictions on…the available pool of circulators or other supporters of a candidate or initiative," strict scrutiny applies.

*Independence Institute*, 936 F.Supp. at 1277 quoting, *Yes on Term Limits v. Savage*, 550 F.3d 1023,1028 (10th Cir. 2008).

Plaintiffs will establish a nearly identical record as that established in *Independence Institute*, and have already begun to do so in the allegations contained in the complaint and the declarations attached to the instant motion.

Plaintiff Ferrell has alleged in the complaint that she will not work for compensation based on an hourly basis, for the simple reason that owing to her skills she can earn more working to circulation petitions in most of the other jurisdictions which permit compensation based on the number of signatures gathered.  *See* Compl. ¶ 28 at pp. 13-14.  Plaintiffs Pierce, Montana Coalition for Rights and Montanans for Citizen Voting testify that they would like to compensate signature gathers for their initiative petition on a per valid signature basis because professional out-of-state circulators, who are needed to gather the required number of valid signatures will not agree to travel to Montana to work for compensation on a per-hour basis because they are able to generate more income from petition drives in other states that permit compensation on a per valid signature basis because their unique skills permit them to collect large numbers of valid signatures in short periods of time which generate more income than they can earn if their income is limited on a per hour basis.  *See*, First Declaration of Nathan Pierce, ¶15; First Declaration of Nels Swandal, ¶15.  These Plaintiffs testify that they have determined that compensation on a per valid signature basis will help ensure that only valid signatures are sought to be collected by the signature gatherers and that the economic incentive is limited to collecting valid signatures while at the same time incentivizing signature gathers to work as hard as possible

to collect as many valid signatures in as short a period of time as possible. *See*, First Declaration of Nathan Pierce, ¶16; First Declaration of Nels Swandal, ¶16.

Plaintiffs also testify that they have also determined that compensation of signature gatherers on a per valid signature basis will lower costs of the signature drive because Plaintiffs will not need to hire additional supervisors to make sure circulators who are only working on a per hour basis are working hard and not shirking their job by collecting as few signatures as possible to avoid being fired. *See*, First Declaration of Nathan Pierce, ¶17; First Declaration of Nels Swandal, ¶17.  Plaintiffs Pierce, Montana Coalition for Rights and Montanans for Citizen Voting also assert that a per valid signature compensation structure will also decrease the number of signature gatherers that need to be fired for poor work habits thereby increasing the efficiency of the signature drive and decreasing the costs associated with training and supervising new signature gathers who would need to be trained to replace circulators fired for poor work habits.  *See*, First Declaration of Nathan Pierce, ¶18; First Declaration of Nels Swandal, ¶¶18-19.

Accordingly, the record evidence that Plaintiffs have begun to establish shows both the severe impairment on First Amendment rights in the form of reducing the pool of available circulators and the direct negative impact on both the cost the ability of Plaintiffs to qualify their initiatives for the 2018 general election ballot.  Likewise, the declarations attached to the instant motion establish

a credible showing that the restriction on payment based on the number of signatures collected actually promotes potential petition fraud the prevention of which is the only possible interest the state can advance in support of the challenged statute.

Therefore, Plaintiffs have demonstrated the requisite likelihood of success for their challenge to Section 13-27-102 (2)(b) of the Montana Code.

## B.    Plaintiffs Will Suffer Irreparable Injury if the Requested Relief is Not Granted.

As noted above, "[t]he loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elron v. Burns*, 427 U.S. 347, 353 (1976).  Therefore, so long as Plaintiffs demonstrate a likelihood of success on the merits of their claims, irreparable injury is established in First Amendment claims.

## C.    Defendants Will Suffer No Injury.

Defendants will suffer no injury should the Court enjoin Sections 13-27-102 (2)(a) and (b) as signatures on Plaintiffs initiative petitions must still be valid and are subject to verification processes which are not at issue in this litigation. Therefore, only initiatives showing the level of voter support required by statute will be able to gain access to Montana's general election ballot.  The requested injunctions do not impair any aspect of the critical procedures necessary to ensure

the integrity of Montana's initiative processes.  Accordingly, Defendants will not be prejudiced by the issuance of the requested injunctions.

### D.  The Public Interest is Served By Issuing the Requested Injunctions.

The requested preliminary injunctive relief will benefit the public because it will ensure that Montana's initiative and referendum process complies with the First Amendment.

### E.  No Security is Required.

Rule 65(c) states that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of costs and damages as may be incurred or suffered by any party found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c).  As noted by one well-known authority, however, "the court may dispense with security altogether if grant of the injunction carries no risk of monetary loss to the defendant."  C. WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2954.  Because Defendants cannot suffer any economic harm resulting from the requested injunctions, no security should be required.

## IV.   <u>**CONCLUSION**</u>

For all the foregoing stated reasons, the requested temporary/preliminary

relief should be granted.

Respectfully submitted,


___**/s/ Chris J. Gallus**_____
Chris J. Gallus

## **CERTIFICATE OF COMPLAINCE**

As legal counsel for Plaintiffs, I hereby certify that this brief is submitted in complaint with USDC MDT-Helena Division Local Rule 7.1 (d)(2) and the length of the brief is 5,386 words according to the relied upon electronic word counter used, and that, consequently a Table of Content and Authorities is provided.

Dated: May 11, 2018        **____/s/ Chris J. Gallus_____**
                        Chris J. Gallus
                        *Attorney for Plaintiff*
                        I.D. #4460
                        1423 Otter Road
                        Helena, MT  59602-7641
                        406.459.8676
                        chrisgalluslaw@gmail.com

## **CERTIFICATE OF SERVICE**

Plaintiffs, by and through their undersigned legal counsel, hereby certify that a true a correct copy of the foregoing has been served on Defendants through their opposing counsel by email.

Dated: May 11, 2018        **____/s/ Chris J. Gallus_____**
                        Chris J. Gallus
                        *Attorney for Plaintiff*
                        I.D. #4460
                        1423 Otter Road
                        Helena, MT  59602-7641
                        406.459.8676
                        chrisgalluslaw@gmail.com