GALLUS LAW
Chris J. Gallus
1423 Otter Road
Helena, MT  5962-7641
Phone:  406.459.8676
Fax:  406.443.0262
Chrisjgalluslaw@gmail.com

IMPG ADVOCATES, INC.
Paul A. Rossi
316 Hill Street
Mountville, PA  17554
717.961.8978
Paul-Rossi@comcast.net

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### HELENA DIVISION

| | |
|---|---|
| **NATHAN PIERCE; MONTANA COALITION FOR RIGHTS; MONTANANS FOR CITIZEN VOTING; LIBERTY INITIATIVE FUND; and SHERRI FERRELL** : | |
| : | **CIVIL ACTION** |
| **Plaintiffs,** : | |
| : | **6:18-cv-00063-CCL** |
| v. : | **Judge Charles C. Lovell** |
| : | |
| **COREY STAPLETON, in his official capacity** : | **PLAINTIFFS'** |
| **as the Secretary of State for the State of** : | **REPLY BRIEF** |
| **Montana; AND, TIM FOX, in his official** : | **IN SUPPORT OF** |
| **as the Attorney General of Montana,** : | **OF PLAINTIFFS'** |
| : | **MOTION FOR** |
| : | **SUMMARY JUDGMENT** |
| : | |
| **Defendants.** : | *Filed Electronically* |

1

**I.     ARGUMENT**

    **A.     Plaintiffs' Witnesses Have Provided Fact Testimony Only**

While Plaintiffs' witness certainly have opinions beyond the fact testimony provided, Plaintiffs' case relies solely on the fact testimony proffered by witnesses in this case based on their experience dealing with the challenged restrictions in Montana and cognate restrictions in other states.

Testimony concerning and relating to the factual experience of the impact of various ballot access restrictions in not within the exclusive domain of expert testimony.  While Plaintiffs' witnesses are far more experienced in the circulation of election petitions than Defendants' own alleged "expert" witness, that does not render Plaintiffs' witnesses as undisclosed expert witnesses.  Plaintiffs are confident that the Court will recognize the testimony proffered by Plaintiffs in support of their claims as proper fact testimony and not expert testimony requiring prior disclosure.

    **B.     Plaintiffs Have Suffered Recognized Injury**

As explained by the Seventh Circuit's opinion in *Krislov v. Rednour*, 226 F.3d 851 (2000), restrictions which substantially reduce:

> [T[he number of potential solicitors, the Illinois requirement reduces
> the voices available to convey political messages. . . .By preventing
> the candidates from employing millions of potential advocates to
> carry their political message to the people of Illinois, the statute places
> a formidable burden on the candidates' right to disseminate their
> message.

*Krislov*, 226 F.3d at 860. Defendants' argument that there is no injury to Plaintiffs (Def's Response Brief at pp. 11-15) flatly ignores the fact that the reduction of the pool of available circulators itself imposes an injury of constitutional import. Mere access to the ballot is not the only cognizable injury to First Amendment protections.

In *Independence Institute v. Gessler*, 936 F.Supp. 2d 1256 (D. Colo. 2013), the court struck down, on strict scrutiny review, Colorado's partial ban on compensating petition circulators based on the number of signatures collected. The district court found that the compensation ban was unconstitutional after evidence was produced that the partial compensation ban caused trained professional circulators to refuse to circulate in Colorado, thereby reducing the pool of persons available to circulate petitions which triggered strict scrutiny review.

Defendants' position that non-residents may not collect signatures with in-state Montana witnesses only compounds and strengthens Plaintiffs' First Amendment injury, particularly Plaintiff Ferrell. Less severe residency requirements which permit out-of-state residents to collect signatures with an in-state witness have been struck as unconstitutional. *See Green Party of Pennsylvania v. Aichele*, 89 F.Supp.3d 723 (E.D.Pa 2015)(citing a developed

consensus that residency restrictions are unconstitutional); *Libertarian Party of Virginia v. Judd*, 718 F.3d 308 (4th Cir. 2013).

Courts have similarly rejected Defendants' argument that out-of-state residents can still communicate to Montana residents (Def. Response Brief at p.14) as insufficient to vindicate rights guaranteed under the First and Fourteenth Amendments. *See Krislov v. Rednour*, 226 F.3d 851, 861-62 (7th Cir. 2000).

### C. Strict Scrutiny Review Applies to Both the Residency Requirement to Circulate Initiative Petitions and the Compensation Ban Based on the Number of Petition Signatures Collected by Initiative Petition Circulators

The evidence in this action is unrefuted that both the residency requirement to circulate initiative petitions and the compensation ban based on the number of signatures collected by initiative petition circulators reduces the pool of circulators available to Plaintiffs to convey their messages to Montana voters and to collect the number of signatures required to gain ballot access. The residency requirement, on its face, mathematically requires such a conclusion and the record evidence in this case demonstrates that the challenged compensation ban based on signatures collected causes professional petition circulators to avoid Montana in favor of jurisdictions which do not interfere on the compensation available to professional petition circulators.

The Supreme Court in *Buckley v. American Constitutional Law Found.*, 525 U.S. 182, 193 n. 15 (1999) ruled the exclusion of large numbers of people from

gathering signatures and thus disseminating political speech triggered strict scrutiny review and in *Meyer v. Grant*, a compensation ban for petition circulators was subject to exacting scrutiny because:

> [I]t limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, this limiting their ability to make the matter the focus of statewide discussion.

*Meyer*, 486 U.S. at 422-23.

Defendants seem to argue that because initiative petitions continue to secure access to the Montana ballot, that this Court should not apply strict scrutiny. In essence Defendants incorrectly invite this Court to alter the standard for strict scrutiny analysis from "less likely…to garner the number of signatures necessary to place the matter on the ballot" to an "impossible to garner the number of signatures" standard. The Supreme Court has never articulated Defendants' impossibility standard for ballot access to trigger strict scrutiny analysis, nor has any other federal district or circuit court of appeal.

The evidence in this case make it clear that both the residency requirement and the compensation ban based on signatures collected both reduce the pool of available circulators and make it less likely that Plaintiffs will be able to place their initiatives on the Montana general election ballot.

### D. Supreme Court has Rejected Residency Restrictions & Compensation Bans as Necessary to Protect Against Fraud at the Petition Stage

Defendants chief argument is that the challenged residency requirement and compensation ban advances Montana's interest in protecting the initiative and referendum process from the threat of fraud. The United States Supreme Court and other federal courts have consistently rejected policing fraud in the petition process as a justification for the imposition of broad residency requirements and compensation bans that reduce the pool of petition circulators that initiative sponsors may associate with to engage in interactive political speech protected as "core political speech" under the First and Fourteenth Amendments. *See*, *Meyer v. Grant*, 486 U.S. 414, 426-28 (1988); *Buckley v. American Constitutional Law Found.*, 525 U.S. 182, 196-97(1999). Defendants' argument that *Buckley* does not control because the Supreme Court did not expressly rule on the constitutionality of state residency requirements (Defs' Response Br. at pp.4-5) is undermined by the Supreme Court's analysis in *Buckley* which focused on the utility of a state's ability to effectively exercise its subpoena powers which all subsequent federal district and courts of appeal have extended to rule residency requirements unconstitutional where the out-of-state circulator is willing to submit to the subpoena power of the state. *See Buckley*, 525 U.S. at 196-97. Accordingly, it is the Supreme Court's analysis in *Buckley* that regulations ensuring petition

6

circulators are readily subject to the state's subpoena power are more narrowly tailored than blanket restrictions on an entire class of circulators is the analysis extended by federal courts in their review of the constitutionality of state residency requirements where a more narrow remedy is available to require out-of-state petition circulators to submit to the state's subpoena power in order to circulate petitions within, in this case, Montana. It is worth noting that the Supreme Court denied defendants' petition for writ of certiorari of the Fourth Circuit's affirmance of the district court's order in *Libertarian Party of Virginia v. Judd*, 718 F.3d 308 (4th Cir. 2013) declaring Virginia's ban on out-of-state petition circulators unconstitutional where the circulators were willing to submit to the subpoena power of Virginia in order to freely circulate candidate petitions in Virginia. *See Judd v. Libertarian Party of Virginia*, 134 S.Ct. 681 (Dec. 2, 2013) *cert denied.*

Defendants' further citation to *Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614 (8th Cir. 2001) as evidence of a lack of unanimity in federal courts declaring residency requirements unconstitutional is misplaced because Plaintiffs have argued that federal courts have been unanimous in striking down residency requirements where courts have considered circulators submitting to the subpoena power of the state in order to be able to freely circulate petitions. The district and circuit courts in *Initiative & Referendum* were not presented with petitioners willing to submit to the jurisdiction of North Dakota and thus did not consider

submission to North Dakota's subpoena power as a factor within its decision. However, every federal court since *Initiative & Referendum* who have been confronted with plaintiffs expressly willing to submit to the subpoena power of the state as a condition precedent to petition circulation has struck residency requirements as unconstitutional, as set forth in Plaintiffs' brief in support.

While protecting the integrity of the initiative process is a legitimate state interest there is simply no evidence that either a residency requirement or a compensation ban protect against petition fraud or that such restrictions are narrowly tailored to survive strict scrutiny analysis where, as in Montana, other, less restrictive methods are available to protect the integrity of the initiative process.

In *Meyer v. Grant*, 486 U.S. 414 (1988), one of the interests Colorado advanced in support of its ban on the payment of compensation to initiative circulators was to protect the integrity of the initiative process by eliminating a temptation to "pad" petitions – i.e., the threat of petition fraud committed by petition circulators motivated by the lure of additional compensation. *See, Meyer* 486 U.S. at 418-19. The Supreme Court explained in *Meyer* that:

> The State's interest in protecting the integrity of the initiative process does not justify the prohibiting because the State has failed to demonstrate that it is necessary to burden appellees' ability to communicate their message in order to meet its concerns. The Attorney General has argued that the petition circulator has the duty to verify the authenticity of signatures on the petition and that

8

> compensation might provide the circulator with a temptation to disregard that duty. No evidence has been offered to support that speculation, however, and we are not prepared to assume that a professional circulator – whose qualifications for similar future assignments may well depend on a reputation for competence and integrity – is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot.
>
> Other provisions of the Colorado statute deal expressly with the potential danger that circulators might be tempted to pad their petitions with false signatures. It is a crime to forge a signature on a petition…to make false of misleading statements relating to a petition…or to pay someone to sign a petition. Further, the top of each page of the petition must bear a statement printed in red ink warning potential signatories that it is a felony to forge a signature on a petition or to sign the petition when not qualified to vote and admonishing signatories not to sign the petition unless they have read and understand the proposed initiative.
>
> These provisions seem adequate to the task of minimizing the risk of improper conduct in the circulation of a petition, especially since the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting.

*Meyer*, 486 U.S. at 426-27.

Montana has had one instance of petition fraud back in 2006. Based on that single experience, Montana jumped to adopt a blanket ban on out-of-state petition circulators and compensation based on the number of signatures collected. However, just as in Colorado in *Meyer*, other provisions in the Montana Code "deal expressly with the potential danger that circulators might be tempted to pad their petitions with false signatures." *See Meyer*, 486 U.S. at 426-27. Montana has also made it a crime to forge a signature on a petition, Mont. Code. Ann. § 13-25-

207(9), punishable by a fine of up to $50,000 or 10 years imprisonment in state prison (or both), Mont Code. Ann §45-7-208. Montana has also made it a crime to make false or misleading statements relating to a petition, Mont. Code. Ann. § 13-35-207(10), punishable by a $500 fine or up to 6 month in a county prison (or both). Furthermore, Montana could also require the printing in red ink at the top of each petition page a statement "warning potential signatories that it is a felony to forge a signature on a petition or to sign the petition unless they have read and understand the proposed initiative." *See Meyer*, 486 U.S. at 427.

Furthermore, the one instance of past petition fraud in Montana in 2006 supports the Supreme Court's statement in *Meyer* that: "These provisions seem adequate to the task of minimizing the risk of improper conduct in the circulation of a petition, especially since the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting." *Meyer*, 486 U.S. at 427. Consistent with the view of the Supreme Court, the record evidence in this action, detached from Defendants' argumentative puffery, establishes that petition fraud is rare Montana, and that the one occurrence in 2006 is insufficient to upend established precedent that residency requirements and compensation bans imposed on the circulation of petitions where the evidence shows such restrictions cause a reduction in the pool of available petition circulators triggers strict scrutiny review. Montana has proffered no evidence of

petition fraud in candidate petitions where out-of-state circulators are permitted and where payments may be made based on the number of signatures collected. Accordingly, Montana cannot argue that petition fraud is anything but rare, and that the lack of fraud in the initiative process is the product of the challenged restriction since there has never been an instance of alleged fraud in the circulation of candidate petitions where the challenged restrictions have never been imposed.

And one word of additional logic is appropriate. In *Meyer*, the United States Supreme Court found no evidence to support the "speculation" that Colorado's complete compensation ban was necessary to protect against petition fraud. Defendants in this case, faced with the Supreme Court decision in *Meyer*, never explain how a partial compensation ban limited to payment based on the number of signatures collected can result in a different judicial determination than that rendered in *Meyer*. After all, Colorado's complete ban included a ban on all compensation, including compensation based on the number of signatures collected. If the Supreme Court has ruled that the larger ban on compensation was not geared toward fending off the "speculation" that compensation, of any sort (including a per signature compensation ban) might tempt petition circulators to engage in fraud, then how can this Court make a determination that Montana's per-signature compensation ban, standing alone, is more effective toward preventing petition fraud than the larger all-encompassing compensation ban struck down as

11

unconstitutional by the Supreme Court in *Meyer*? The answer is, respectfully, that Defendants have produced no evidence to warrant this Court to reverse the Supreme Court's logic articulated in *Meyer*, and that Montana's compensation ban based on signatures collected, once evidence is established that it reduces the pool of available circulators and the likelihood of ballot access, fails under strict scrutiny review.

Furthermore, when "the Government defends a regulation on speech as a means to…prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured." *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994). It must show that the "recited harms are real, not merely conjectural" ***and*** that the regulation will in fact materially alleviate the anticipated harm. *Id*. While Defendants trumpet the single instance of petition fraud in 2006 as a justification for the challenged restrictions, Defendants have failed to show that the challenged residency requirement and compensation ban based on signatures collected will in fact materially alleviate the anticipated harm of petition fraud. Defendants cannot make this showing because there has been no allegation of petition fraud in the arena of candidate petitions where the challenged restrictions are not in place. In *Krislov v. Rednour*, 226 F.3d 851 (2000), the Seventh Circuit found that defendants in that case offered no evidence to suggest that the residency requirement to circulate candidate petitions was necessary "even

though the residency and [voter] registration requirements were added to the law about 1979, giving the Board an opportunity to compare petitions from before and after the amendment to determine whether the law has decreased the number of invalid signatures." *Krislov*, 226 F.3d at 864. If Montana could demonstrate an ongoing experience with petition fraud in candidate petitions where the restrictions are not in place then, Defendants might have an argument to rebut strict scrutiny. But that is not the case. In Montana there has been only one recorded instance of fraud in the initiative petition arena and no petition fraud in the circulation of candidate petitions where the challenged restrictions have never been in place.

  Defendants point to a single instance back in 2006 in which fraud occurred in Montana. Def. Brief at pp. 16-25. This single instance is not the kind of "history" that some courts have discussed as perhaps permitting a residency requirement. In fact, Defendants' own expert witness, CB Pearson, admitted that there is no evidence of petition fraud, by anyone, in the candidate petition arena where nonresidents have freely circulated election petitions for candidates. *See*, CB Pearson Dep. at 188:19-190:2. Defendants' expert witness admits the 2006 petition fraud is the only case of petition fraud in Montana. *See*, CB Pearson Dep. at 189:9-190:2. Plaintiff Ferrell circulated candidate petitions in Montana for Newt Gingrich's presidential campaign in 2012, all without incident. *See*, Ferrell Dep. at 11:4-12:11. Consistent with CB Pearson's testimony, Defendants have

failed to produce a single allegation of petition fraud in Montana either before or after the 2006 incident.

And it is because that Montana has such a sparse history of petition fraud that Defendants are desperate to cast aspersion on Plaintiffs for any slight and unfounded allegation that has ever been made about them – based on an expunged unfounded charge against Paul Jacob, a single civil litigation that was settled which did not allege fraud against Tim Money and a hyper-partisan allegation of fraud in Wisconsin's recall drama against Plaintiff Ferrell (out of over 500 petitions free of any such allegations) which nevertheless resulted in a 91% signature validity rate for her work in Wisconsin.

Defendants' characterization of legitimate political speech as not far removed from the bait-and-switch tactics that were widespread in 2006 (Def. Response Br. at pp. 19-22) is sophistry and a manifestation of Defendants' willingness to ignore First Amendment freedoms. The First Amendment permits circulators to circulate multiple petitions at the same time. What is not permitted under the First Amendment is telling a petition signer to sign multiple petition pages and not affording them the opportunity to read the petitions they are asked to sign – that is what happened in 2006 in Montana, and that is not what Hurst related in his testimony with respect to Plaintiff Ferrell or the practice of legitimate "stacking" or advocacy of multiple issues by a circulator.

## II.  **CONCLUSION**

For all the forgoing reasons and the reasons set forth in Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment, Plaintiffs' Motion for Summary Judgment as to Counts I, II, III and IV of Plaintiffs Amended Complaint should be granted.

Respectfully submitted,

Dated:  November 18, 2019              __/s/ **Paul A. Rossi**_____
                                       Paul A. Rossi
                                       *Counsel for Plaintiffs*
                                       IMPG Advocates, Inc.
                                       316 Hill Street
                                       Mountville, PA  17554
                                       717.681.8344
                                       Paul-Rossi@comcast.net

## CERTIFICATE OF SERVICE

Plaintiffs, by and through their undersigned legal counsel, hereby certify that on this date, they have caused a true and correct copy of the foregoing document to be filed with the Clerk of the Court for the United States District Court for the District of Montana by using the Court's CM/ECF system.

I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

Dated:  November 18, 2019                                s/ Paul A. Rossi_____
                                                                               Paul A. Rossi
                                                                               *Counsel to Plaintiffs*

## CERTIFICATE OF COMPLIANCE PURSUANT TO L.R. 7

Pursuant to Rule 7 of the Local Rules of Civil Procedure, Plaintiffs, by and through their undersigned legal counsel, hereby certifies that the body of the foregoing brief, contains 3,194 words, as determined by the word count function of Microsoft Word software used to prepare this document.

Dated:  November 18, 2019                                s/ Paul A. Rossi_____
                                                                               Paul A. Rossi
                                                                               *Counsel to Plaintiffs*