IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| NATHAN PIERCE; MONTANA COALITION FOR RIGHTS; MONTANA COALITION FOR CITIZEN VOTING; SHERRI FERRELL; and, LIBERTY INITIATIVE FUND, | Cause No. CV 18-63-H-CCL |
| Plaintiffs, | |
| vs. | OPINION & ORDER |
| COREY STAPLETON, in his official capacity as the Secretary of State for the State of Montana; and, TIM FOX, in his official capacity as Attorney General of Montana, | |
| Defendants. | |

Plaintiffs Nathan Pierce, Montana Coalition for Rights, Montana Coalition for Citizen Voting, Sherri Ferrell, and Liberty Initiative Fund filed this action challenging the constitutionality of Montana Code Annotated § 13-37-102(2), which requires that signature gatherers for an initiative, referendum, or constitutional convention be Montana residents and that they not be paid based upon the number of signatures gathered. The challenge is premised upon the First and Fourteenth Amendments of the United States Constitution.

1

Plaintiffs claim the residency requirement of MCA §13-27-102(2)(a) violates the First Amendment by limiting their ability to recruit out-of-state petition circulators and, in turn, makes it difficult to get their petition on the ballot. Plaintiffs also claim the prohibition on paying petition circulators per signature, contained at MCA §13-27-102(2)(b), violates the First Amendment by increasing costs and reducing the pool of petition circulators to hourly workers. Defendants ask the Court to uphold the constitutionality of the challenged statute, asserting the statute advances and protects the First Amendment interests of the citizens of Montana, including the constitutional right to self-government.

Additionally, Plaintiffs claimed in their Amended Complaint that MCA §13-27-102(2) violates Equal Protection principles because the statute's prohibitions apply only to initiative petitions, and not to candidate petitions.[1] Plaintiffs also asserted petition circulation constitutes interstate commerce and that the prohibition on nonresident circulators violates the Commerce Clause.[2] Although Defendants briefed these claims in their request for summary judgment,[3] Plaintiffs affirmatively abandoned these same claims in their Response.[4] Accordingly, Defendants will be granted summary judgment on claims V, VI, and VII, of the

---

[1] See, Amd. Cmplt. (Doc. 18 at 40-42, Counts V & VI)(Equal Protection Claims).
[2] See, *Id*. at 42-43, (Count VII)(Commerce Clause Claim).
[3] See, (Doc. 37 at 35-39.)
[4] See, (Doc. 49 at 30.)

Amended Complaint.

Pending now before the Court are cross-motions for summary judgment on Claims I, II, III, and IV.  The Court finds the matter is appropriate for determination without a hearing.  Further, the Court finds Montana's challenged law to be constitutional.  Accordingly, Defendant's Motion for Summary Judgment (Doc.  36) will be GRANTED; and, Plaintiff's Motion for Summary Judgment (Doc. 40) will be DENIED.

## I.   Background

### A. History of MCA §13-27-102(2)(2007)

In adopting Montana's 1972 Constitution, the people of the State "reserved unto themselves the exclusive right of" self-government and to thereby "alter or abolish the constitution whenever" they deem necessary.  *State ex rel. Montanans For Preservation of Citizens Rights v. Waltermire* (1988), 231 Mont. 406, 412, 757 P. 2d 746, 750.  The Montana Constitution reserves unto Montana citizens the right to amend the constitution and to enact laws by initiative.  Mont. Const. art. XIV, § 9; Mont. Const. art. III, § 4.

The initiative process begins by a person or entity submitting a ballot initiative to the Secretary of State's Office, which in turn, sends the ballot initiative to Montana Legislative Services for review.[5]  If Legislative Services approves the

---

[5] See, (Doc. 37-2 at 2, ¶ 3)(Decl. of Corson)(citing MCA §13-27-202(2)(a)).

petition, the petition is then sent to the Attorney General for legal sufficiency review which must be completed within 30 days.[6] If the ballot initiative passes this legal sufficiency review, the Secretary of State notifies the ballot initiative sponsor and the petition signature gathering can start.[7] The ballot initiative process, whether statutory or constitutional, requires an initiative proponent to gather a specific percentage of voter signatures to qualify their initiative for the ballot.[8] The first day to circulate approved initiative petitions for an election cycle is approximately 1-year before the signatures in support of a petition must be submitted.[9]

In March of 2006, proponents of two constitutional initiatives and one statutory initiative began gathering signatures for submission to county election administrators for certification.   Once the signed petitions were submitted, they were certified and then submitted to the Secretary of State.  Because each of the ballot initiatives garnered more than the required number of signatures, they were then certified to the Governor in July of 2006. See, *Montanans for Justice v. State*, 2006 MT 277, ¶¶ 11-12, 334 Mont. 237, 146 P. 3d 759.  In August of 2006, a complaint was filed in which it was alleged that the proponent signature gatherers

---

[6] *Id.*, citing MCA §13-27-312(8)(a).
[7] *Id.* at 3, ¶ 6, citing MCA §13-27-202(5)(b).
[8] See, MCA §§13-27-204 & 207 (outlining form requirements for Petition for Initiative and Petition for Constitutional Amendment).
[9] See, (Doc. 37-2 at 3-4, ¶¶8-9.)

violated statutory requirements governing ballot issue petitions by obtaining

signatures in a deceptive manner and falsely swearing to the contents on the

signature gatherers' affidavits. *Id.* at ¶ 13. Following a bench trial in Montana's

Eighth Judicial District, the state District Court found that the signature gathering

process engaged in by proponents of the three initiatives was permeated by fraud

and procedural noncompliance. *Id.* at ¶ 2. The District Court invalidated the

signatures obtained by specific signature gatherers and invalidated the Secretary of

State's certifications of the initiatives. *Id.*

The uncontroverted evidence established that while some Montana citizens

were used to collect signatures, the initiative proponents relied primarily upon paid

out-of-state signature gatherers to obtain an "overwhelming majority" of the

signatures submitted. *Id.* at ¶ 11. Proponents paid over $633,000 to out-of-state

signature gatherers for the three initiatives; each signature gatherer was paid

between $0.50 and $2.50 per signature per initiative. *Id.* The District Court

determined: (1) out-of-state signature gatherers routinely attested that they

personally gathered or assisted in gathering signatures that were gathered by other

persons outside of their presence and without their direct assistance; (2) all 43 of

the out-of-state signature gatherers used false addresses on their certification

affidavits; and, (3) at least some of the out-of-state signature gatherers employed

deceitful "bait and switch" tactics. *Id.* at ¶ 44.[10]  The Montana Supreme Court affirmed the findings of the District Court and its order invalidating the initiative certifications. *Id.* at ¶¶ 59, 73, 79, 88.

In response to the fraud that had occurred, the 2007 Montana Legislature passed Senate Bill 96, which required a person circulating an initiative petition to be a Montana resident who is not paid anything of value based on the number of signatures gathered.[11]

In the election cycles between 2008 and 2018, twelve petitions qualified for the ballot.[12]  In the 2020 election cycle, two petitions were certified to appear on the general election ballot.[13]

## B. Parties in the Present Matter

Plaintiff Nathan Pierce is a founder of the Montana Coalition for Rights, "an ad hoc or a loose coalition of Montanans" who engage in lobbying work and advancing ballot initiatives.[14]  This entity has been active since 2007, but has been repeatedly dissolved and reformed over the years.[15]  Montana Coalition for Rights

---

[10] A copy of Judge Sandefur's District Court order in *Montanans for Justice v. State*, Cause No. DCV-06-1162(d) (Sept. 13, 2006), is attached to the Defendant's Motion for Summary Judgment.  See, (Doc. 37-1 at 10-56.)
[11] See, MCA §13-27-102(2)(2007).
[12] (Doc. 37-2 at 5, ¶ 17)(Decl. of Corson); see also, (Doc. 37-3 at 11-15)(Pearson Expert Report)
[13] See, Montana Secretary of State Website: https://sosmt.gov/elections/ballot_issues/2020-2/ (accessed November 30, 2020).
[14] Doc. 39 at 3, ¶ 7)(Stip. Facts); see also, (Doc. 42 at 18, ¶ 103.)
[15] Doc. 39 at 3, ¶¶ 5-6)(Stip. Facts).

sponsored Ballot Issue 15 in the 2018 election cycle, which sought to "prevent[ ] the legislature from immediately overturning ballot initiatives." The issue, however, did not progress to the point where signature gathering took place.[16]

Plaintiff Sherri Ferrell is a professional signature gatherer/petitioner and coordinator based in Florida who works across the United States.[17] Although Ferrell worked in Montana once, qualifying candidate Newt Gingrich for the ballot, she has never performed initiative petitioning services in Montana.[18]

In April of 2018, Montanans for Citizen Voting ("MCV") was incorporated to secure ballot access for a "citizens voting" initiative, aimed at limiting voting in Montana to lawful citizens.[19] Paul Jacob ("Jacob") is the President of Liberty Initiative Foundation, also called Liberty Initiative Fund, and Citizens in Charge.[20] Liberty Initiative Fund and/or Citizens in Charge have been involved in challenging residency requirements in Nebraska and Ohio, Liberty Initiative Fund has provided funding to get measures on ballots in various states, and Citizens in Charge has provided funding to assist with various lawsuits.[21] In October or November of 2017, Jacob discussed the idea of a citizen voting initiative with Tim Mooney ("Mooney"). Mooney is a political consultant from Arizona, who owns a

---

[16] (Doc. 39 at 3, ¶¶ 9-10)(Stip. Facts).

[17] Doc. 39 at 7, ¶ 36)(Stip. Facts); see also, (Doc. 42 at 15, ¶ 80); (Doc. 43-2 at 6-12.)

[18] (Doc. 43-2 at 12-14.)

[19] (Doc. 42 at 9, ¶ 47); see also (Doc. 39 at 4, ¶¶ 14-15.)

[20] (Doc. 42 at 9, ¶ 49); (Doc. 37-1 at 63.)

[21] (Doc. 37-1 at 65-66, 92) (Jacob Depo.).

political consulting firm called Silver Bullet, which is incorporated in Wyoming.[22]
Jacob and Mooney discussed potential states that would be ideal for bringing
forward such an initiative; they identified Montana as a state where the measure
might be successful.[23]  In late February or early March of 2018, Jacob discussed
the citizen voting initiative with Montana attorney, Chris Gallus, and it was
determined Montana would potentially be a good state to bring the constitutional
measure forward.[24]

Jacob came to Montana in March of 2018 to secure a committee of people
that could push the Montanans for Citizen Voting initiative forward.[25]  Jeff Essman
and Nels Swandal were recruited to be part of the effort; Swandal was made the
lead petitioner.[26]  Jacob identified potential volunteers for the petition drive.[27]

Jacob solicited bids for the petition drive.  One of the bids was from Chuck
Denowh, with Advanced Micro Targeting ("AMT"), a voter contact firm based in
Texas.[28]  The other bid was from Mooney's Firm, Silver Bullet.[29]  AMT's bid was
for $500,000 and expressly stated it "does not pay by the signature because it

---

[22] (Doc. 37-1 at 78-79) (Jacob Depo.); see also (Doc. 37-1 at 102-3) and (Doc. 43-1 at 31-
32)(Mooney Depo.); see also (Doc. 39 at 4-5, ¶¶ 17-18)(Stip. Facts).
[23] (Doc. 37-1 at 79) (Jacob Depo.); see also (Doc. 37-1 at 104-5, 107)(Mooney Depo.); see also
(Doc. 39 at 5, ¶ 19) (Stip. Facts).
[24] (Doc. 37-1 at 79-80) (Jacob Deposition); see also, (Doc. 39 at 5, ¶ 20)(Stip. Facts).
[25] (Doc. 37-1 at 81) (Jacob Deposition); see also, (Doc. 39 at 5, ¶ 23)(Stip. Facts).
[26] (Doc. 37-1 at 85) (Jacob Deposition); see also, (Doc. 39 at 6, ¶ 24)(Stip. Facts).
[27] (Doc. 39 at 6, ¶ 26)(Stip. Facts).
[28] See, (Doc. 42-4)(AMT proposal).
[29] (Doc. 37-1 at 87-88) (Jacob Deposition); see also; (Doc. 42-3)(Silver Bullet proposal).

encourages fraud."[30]

Jacob had concerns about Montana's pay-per-signature restriction and residency requirements.[31]  Jacob asked Mooney to provide him with an alternate bid for the petition drive, in the event that they were able to challenge and successfully enjoin the residency and pay-per-signature provisions, and detail what that would equate to in cost savings.[32]  Silver Bullet's bid was for $469,000 for 80,000 gross signatures, but also included a provision that if Montana's pay-per-signature ban and residency requirement were lifted, the overall petition drive cost would cost $1.00 less per signature.[33]

On May 9, 2018, Plaintiffs filed the present lawsuit followed by an Emergency Motion for Temporary Restraining Order or Preliminary Injunction.[34] On May 18, 2018, Plaintiffs withdrew their motion for the restraining order.[35]  The deadline for submitting signatures for the 2018 ballot was June 22, 2018.[36] Montanans for Citizen Voting did not attempt to qualify CI-117 for the 2018 ballot.  Likewise, none of the Plaintiffs in this matter, including Montanans for Citizen Voting, pursued any activity to qualify a ballot initiative for the 2020

---

[30] (Doc. 39 at 6, ¶¶ 28-29); see also, (Doc. 42-4 at 3.)
[31] (Doc. 37-1 at 91) (Jacob Deposition).
[32] (Doc. 37-1 at 91.)
[33] (Doc. 42 at 13); see also, (Doc. 42-3); see also, (Doc. 39 at 6-7, ¶¶ 31-32)(Stip. Facts).
[34] (Docs. 1 & 2.)
[35] (Doc. 15.)
[36] (Doc. 39 at 2-3, ¶ 4)(Stip. Facts).

election cycle.[37]   Additional facts will be discussed, as necessary, below.

## II.   Analysis

### A. Summary Judgment Standards

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). On a motion for summary judgment, this Court must determine whether a fair-minded jury could return a verdict for the nonmoving party. *Id.* at 252.

In evaluating the appropriateness of summary judgment, the Court must first determine whether a fact is material; and, if so, it must then determine whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the Court.

If a fact is found to be material, summary judgment will not lie if the dispute about that fact is not genuine. In other words, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248. In essence, the inquiry is whether the evidence presents a sufficient disagreement to require

---

[37] (Doc. 39 at 7, ⁋ 33)(Stip. Facts); see also, (Doc. 37-2 at 4, ⁋ 11) (Decl. of Corson).

submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 251-52. Thus, at the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Id.* at 249-50. If the evidence, however, is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.*

A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.

## B. First Amendment Standards

The First Amendment, made applicable to the states through the Fourteenth Amendment, forbids the enactment of any law "abridging the freedom of speech." U.S. Const. amend. I; *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 & n. 1 (1995). Political speech, including that associated with petition circulation, lies at the core of this speech, and is protected by the First Amendment, because it involves "interactive communication concerning political change." *Meyer v. Grant*, 486 U.S. 414, 422 (1988). But courts have also acknowledged there is an inevitable tension between a state's authority and need to regulate its elections and the First and Fourteenth Amendment rights of voters, candidates, and political parties. See, *Storer v. Brown*, 415 U.S. 724, 729-30 (1974). There is no federal

constitutional right to place initiatives on ballots and "States allowing ballot

initiatives have considerable leeway to protect the integrity and reliability of the

initiative process, as they have with respect to the election processes generally."

*Prete v. Bradbury*, 438 F. 3d 949, 961 (9th Cir. 2006), citing, *Buckley v. Am.*

*Constitutional Law Found.*, 525 U.S. 182, 191 (1999); see also, *Meye*r, 486 U.S. at

424 (recognizing that "the power of the initiative is a state-created right").

Buckley advised there is "no litmus-paper test" to separate valid ballot-

access provisions from invalid interactive speech restriction.  525 U.S. at 183.

Rather, courts generally apply the pliable *Anderson-Burdick* framework when the

constitutionality of a ballot access measure is challenged on First Amendment

grounds. See, *Reclaim Idaho v. Little*, —— F.Supp.3d ——, ——, 2020 WL

3490215, at *7 (D. Idaho June 26, 2020) (citing *Anderson v. Celebrezze*, 460 U.S.

780 (1983); *Burdick v. Takushi,* 504 U.S. 428 (1992)); see also, *Initiative &*

*Referendum Inst. v. Jaeger*, 241 F. 3d 614, 616 (8th Cir. 2001).  The framework

provides a flexible approach that balances the severity of the restriction against the

government's purported interest. *Dudum v. Arnzt*, 640 F. 3d 1098, 1105-06 (9th

Cir. 2011). Under the test:

> A court considering a challenge to a state election law must weigh
> "the character and magnitude of the asserted injury to the rights
> protected by the First and Fourteenth Amendments that the plaintiff
> seeks to vindicate" against "the precise interests put forward by the
> State as justifications for the burden imposed by its rule," taking into

consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick,* 504 U.S. at 434 (quoting *Anderson,* 460 U.S. at 789).  Thus, if Plaintiffs demonstrate the existence of severe burden, strict scrutiny applies, if not, the degree of scrutiny is relaxed.  See, *Ariz. Green Party v. Regan,* 838 F. 3d 983, 985 (9th Cir. 2016).

In *Meyer,* the Supreme Court identified two potential burdens on political expression arising from state regulation of petition circulation.  The fist type occurs when a ballot-access measure "limits the number of voices that will convey [Plaintiffs'] message…and, therefore, limits the size of the audience they can reach." *Meyer,* 486 U.S. at 422-23.  The second type of harm occurs when a regulatory scheme "makes it less likely that [Plaintiffs] will garner the number of necessary signatures, thus limiting their ability to make the matter the focus of statewide discussion. *Id.* at 423.

In *Angle v. Miller,* involving a challenge to a Nevada law requiring proponents of a ballot initiative to obtain signatures from at least 10% of registered voters in each of Nevada's congressional districts, the Ninth Circuit focused on this second type of harm.  See, *Angle v. Miller,* 673 F. 3d 1122, 1133 (9th Cir. 2012). The Court held the test was whether a "reasonably diligent" initiative campaign could have secured a place on the ballot despite the challenged regulation.  *Id.,* citing *Nader v. Brewer,* 531 F. 3d 1028 (9th Cir. 2008).  The Court found the

plaintiffs' declarations proffering that the regulation inhibited their ability to get the initiatives on the ballot to be too vague and speculative and noted that the plaintiffs presented no evidence that "other initiative proponents have been unable to qualify initiatives for the ballot as a result of the [challenged law]." *Id.* at 1133-34. The court applied less exacting scrutiny and found the law passed constitutional muster because it was supported by important regulatory interests – that is, Nevada's interest in ensuring state-wide support for initiatives and avoiding voter confusion. *Id.* at 1134-36.

### C. Claims I & II: First Amendment Challenge to Non-Resident Circulator Prohibition

Plaintiffs assert that strict scrutiny applies in the present matter and provide no other analysis surrounding less-exacting forms of scrutiny.[38] Defendants take issue with the majority of the cases cited by Plaintiffs in support of their strict scrutiny assertion,[39] and contend that because Plaintiffs failed to show the existence of a severe burden, instead proffering only conclusory allegations, less stringent scrutiny necessarily applies.[40]

As explained below, Plaintiffs provide only speculative claims and fail to meet their burden. "Speculation, without supporting evidence," is insufficient to

---

[38] See generally, (Doc. 41 at 11-18); (Doc. 49 at 15-19); (Doc. 52 at 4-5).
[39] See e.g., (Doc. 47 at 7-12.)
[40] See, (Doc. 51 at 4-5)

demonstrate that the statutory scheme results in a severe burden. *Angle*, 673 F. 3d at 1134.  Because less exacting scrutiny applies, this Court finds the residency requirement to be constitutional.  Further, it is supported by Montana's regulatory interest in protecting the integrity of its ballot initiative process, based upon the state's unique historical circumstances.

### i.    Burden Upon First Amendment Rights

As set forth above, this Court must first examine the severity of the burden imposed upon the Plaintiffs, by looking at the type of harm alleged to have occurred.  In order for strict scrutiny to apply, Plaintiffs must show the Montana residency requirement severely burdened their rights.

### Limitation on Voices/Audience Reached

Although Plaintiffs did not directly address the *Anderson-Burdick* test, in relation to this first category of harm, Plaintiffs' argument would seem to be that the non-resident circulator prohibition will result in harm because such restriction decreases the number of available message carriers.  See e.g., (Doc. 41 at 11-12, 14-15).  Plaintiffs point to the Ninth Circuits decision in *National Association for Gun Rights, Inc. v. Mangan, et al., (NAGR),* 933 F. 3d 1102, 1121 (9th Cir. 2019), cert. denied, 140 S. Ct. 2825 (2020), in which the Circuit invalidated Montana's requirement that a political committee's designated treasurer be a registered

Montana voter.[41]  The *NAGR* Court, relying on *Buckley*, observed that, "The

particular First Amendment harm that restrictions on petition circulators pose is

that they 'limit the number of voices who will convey the initiative proponents'

message and, consequently, cut down the size of the audience proponents can

reach.'" [42]  Plaintiffs argue, then, by virtue of the residency requirement that

325,000,000 American citizens, who happen to also be non-Montana residents, are

automatically excluded from participating in circulating Montana initiative and

referendum petitions.  This, in turn, reduces the pool of available professional

circulators who work across the country.[43]  Plaintiffs assert that by eliminating

professional petition circulators in Montana, the actual effect is that it eliminates

the very individuals who are best able to convey proponents' message and

increases the overall cost of signature gathering.[44]  In support of this argument,

Plaintiffs cite to portions of the deposition transcripts of Jacob, Mooney, Ferrell,

and Pierce.[45]

The Court would begin by noting that the *NAGR* court did not apply strict

scrutiny.  Applying less exacting scrutiny, it did invalidate the registered voter

---

[41] The Court notes that Plaintiffs in this action advanced a similar claim.  See, Counts VII and IX of Amended Complaint. (Doc. 18 at 43-45.)  Following the *NAGR* decision, and pursuant to the Plaintiffs unopposed motion, Counts VII and IX were dismissed without prejudice.  (Doc. 33.)
[42] See, (Doc. 41 at 15)(citing *NAGR*).
[43] *Id.* at 16.
[44] *Id.* at 16-17.
[45] See e.g., (Doc. 41 at 16-17) (citing to Plaintiff's SUF) (Doc. 42 at ¶¶ 129, 130, 131, 43, 44, 48, 96, 100, 114, 34, 36, 37, 38, 39, 41, 43, 45, 46, 48, 59, 60, 66, 68, 85, 90, 114, 124, 136).

requirement, but observed it was doing so because Montana failed to identify, nor could the Court locate, an interest served by excluding potential treasurers from political committees who are not registered voters but could be if they chose. *NAGR*, 933 F. 3d at 1121.  But the Court is not convinced that this case stands for the bright-line principle, which Plaintiffs assert, that strict scrutiny must apply in the present case.

As to the evidence Plaintiffs point to in support of their position, it is also not convincing.  Although Jacob certainly has extensive experience working on campaigns and challenging election laws in other states, he has never participated in the signature gathering process in Montana.[46]  The Court notes Mooney did testify the residency requirement would make contracting with his firm for a ballot initiative difficult; he also testified that the low state unemployment rate and relatively high pay scale contribute to make Montana a "more difficult and costly state."[47]  Mooney was of the belief that because Montana does not have a large number of petitions circulating in an election cycle, there is not a ready pool of people who are experienced in getting signatures for an initiative petition.[48]  But while Mooney has done candidate work in Montana, he has not done any petition

---

[46] See, (Doc. 37-1 at 63, 65-66, 69, 92)(Jacob Depo); see also, (Doc. 42 at 9, ¶¶ 47, 49); (Doc. 39 at 4, ¶¶ 14-15.)
[47] See, (Doc. 43-1 at 46:2-18.)
[48] *Id.* at 95:1-96:8.

work.[49]

Plaintiffs cite to testimony from Ferrell for the proposition that while someone with her circulation experience may wish to participate in Montana's petition circulation, the residency requirement precludes such participation.[50]  In the same vein, Plaintiffs assert Jacob asked Ferrell to work on CI-117 and she said she would if the residency requirement and pay-per-signature ban were eliminated.[51]  Likewise, Nathan Pierce states he would like to contract with Ferrell at some point in the future on an unidentified ballot measure for Montana Coalition for Rights.[52]

But as explained further below, all of these assertions are merely conclusory, because Plaintiffs did not move forward with either Montana Citizen Voting's petition drive for CI-117, or with Montana Coalition for Rights ballot initiative CI-115, or something similar, in either the 2018 or 2020 election cycles.

Pierce is the only one of the Plaintiffs referenced that has actual experience working on Montana initiate petition drives. To the extent that Plaintiffs seek to present testimony from Pierce to support the proposition that there are not enough Montanans trained with the "unique skill set" as circulators and that there exists a

---

[49] *Id.* at 18:8-11; 44:5-7; See also, (Doc. 50 at 10, ¶ 38)(detailing Mooney's experience on candidate campaigns, but not ballot initiatives).
[50] See e.g., (Doc. 42 at 18, ¶ 100.)
[51] *Id.* at 17, ¶ 96; see also, (Doc. 43-2 at 180-81)(Ferrell Depo.)
[52] *Id.* at 20, ¶ 114.

labor shortage, as pointed out by Defendants, Pierce's own testimony defeats such speculative claims.  Pierce acknowledged he has attended trainings, has trained others, and agreed that there was nothing preventing MCR from training Montanans to gather signatures.[53]  Pierce estimated it takes between an hour and an hour and a half to complete training to be a circulator.[54]  Similarly, Pierce noted Montanans who are paid circulators have successfully qualified ballot initiatives.[55]

Plaintiffs claim that the Defendants' expert, C.B. Pearson, acknowledged the pool of experienced petition circulators in Montana is small, and that there are no firms in Montana that focus solely on signature collection.[56]  While this may be true, Plaintiffs' witness, Mooney, testified that there are only five or six big national petition-circulating firms in the country, and maybe a dozen localized firms around the country.[57]  Thus, a potential shortage of firms focused solely on signature gathering does not necessarily seem to be a problem, but even if it is, it is not one that is unique to Montana.

Furthermore, the Court takes note of the observations and conclusions advanced by Pearson, gleaned from his more than four decades in public service, more than 30 of which involve Montana's initiative and referendum process.[58]

---

[53] See, (Doc. 37-1 at 142-151.)
[54] See, (Doc. 37-1 at 147.)
[55] See, (Doc. 43-4 at 39.)
[56] (Doc. 49 at 17.)
[57] See, (Doc. 43-1 at 130: 12-22.)
[58] See, (Doc. 37-3 at 8-41)(Pearson Expert Report).

19

Pearson stated that his firm, M+R Strategic Services, trains every person working on one of their initiative campaigns, whether paid or a volunteer, and that such training takes between 60 and 90 minutes.[59]   Pearson notes that since 2008, there have been successful initiative efforts on a variety of issues that have utilized a combination of: in-state campaigning firms, out-of-state signature gathering firms, their own paid staff and Montana volunteers, or some combination.[60]   Pearson concluded that any proposed initiative campaign can hire either in-state or out-of-state organization or firms to run their campaign or signature gathering effort.[61] Pearson further opined that hiring only Montana residents for signature gathering did not disadvantage the proposed ballot initiative in qualifying and that "[h]iring Montanans to talk to Montanans is an advantage if the goal of the campaign is to win at the ballot box."[62]

In short, Plaintiffs have offered speculative opinions about what might have happened, or what they may believe to be true, but have provided little to no actual evidence that the residency requirement put a limitation on the voices or the audience they were able to reach.   Plaintiffs have not demonstrated that there are not enough Montana residents to serve as circulators or that Montana residents are

---

[59] Id. at 8-9.
[60] *Id.* at 10.
[61] *Id.*
[62] *Id.*

inferior communicators. See e.g., *Idaho Coalition United For Bears v. Cenarrusa*, 234 F. Supp. 2d 1159, 1163 (D. Idaho 2001), *aff'd,* 342 F.3d 1073 (9th Cir. 2003). Both Pierce and Pearson acknowledge that Montanan signature-gatherers have successfully qualified ballot initiatives. Pearson believes that it oftentimes is beneficial to have Montanans speaking to issues unique to our state. Moreover, as explained by Pearson, out of state residents are not excluded from Montana's electoral process, out of state campaigning and signature gathering firms can, and have, coordinated successful initiative efforts in Montana.

### Limitation on Signatures/Statewide Discussion

As set forth above, in relation to this type of harm, courts have held the test is whether a "reasonably diligent" initiative campaign could have secured a place on the ballot despite the challenged regulation. *Angle*, 673 F. 3d at 1133 (citing *Nader v. Brewer*, 531 F. 3d 1028 (9th Cir. 2008)). Or put another way, courts apply strict scrutiny when: (1) the proponents of the initiative have been 'reasonably diligent' as compared to other initiative proponents; and (2) when the restrictions significantly inhibit the proponents' ability to place an initiative on the ballot. See, *Reclaim Idaho*, 2020 WL 3490216, at *8, citing *Fair Maps Nevada v. Cegavske*, — F.Supp.3d ——, ——, 2020 WL 2798018, at *11 (D. Nev. May 29, 2020).

Plaintiffs argue that the residency requirement makes it less likely that the proponents will gather the number of signatures required to secure ballot access.

In support of this position, Plaintiffs cite to deposition transcripts of Jacob, Mooney, Pierce and Hurst.[63]   As a preliminary matter, the Court would note that since the enactment of MCA §13-27-102(2)(a), 14 initiative petitions have qualified for the ballot.  But when comparing the actions of Plaintiffs to other initiative proponents, they have not exercised "reasonable diligence." As set forth above, Montana Coalition for Rights submitted Ballot Issue 15 in the 2018 election cycle, but it did not progress to the point of signature gathering prior to the filing of this lawsuit.  Likewise, Montana Coalition for Rights did not submit any similar ballot initiative for the 2020 election cycle.

Montanans for Citizen Voting also did not act diligently.  They waited until April 2018 to incorporate.  At that point, instead of beginning to gather signatures, they filed the instant lawsuit and the corresponding Emergency Motion for Temporary Restraining Order or Preliminary Injunction.[64]  Plaintiffs subsequently withdrew their motion for the temporary restraining order and took no further steps to qualify CI-117 for either the 2018 or 2020 election cycle.

Mooney testified that Silver Bullet's bid was never accepted and no work began on the signature gathering because "we are trying to get through [this law suit] right here" and the outcome would have a bearing upon what the ultimate

---

[63] See, (Doc. 41 at 16); (Doc. 42 at 21, P 128.)
[64] See, (Docs. 1&2.)

22

price of the contract would be.[65]  While plaintiffs contend Mooney did not prepare

the Silver Bullet bid in preparation of this litigation,[66] once Plaintiffs dismissed

their request for the TRO and the residency requirement was not enjoined,

Mooney's advice to Jacob was to not move forward with CI-117:

> Q:   And once the residency requirement wasn't enjoined in this case, did
>      you advise Paul Jacob?
> A:   Skip it. Yeah.
> Q:   And what was your advice to Paul Jacob with respect to whether or
>      not to go forward with the petition?
> A:   Don't. Don't go forward. Skip it.
> Q:   Okay.
>      So you advised Paul Jacob that they should not move forward under
>      this bid?
> A:   Exactly.[67]

Further, as Plaintiffs acknowledge, Jacob and the Liberty Initiative Fund had

no intentions of moving CI-117 forward in the 2020 election.  Jacob explained his

viewpoint:

> If everything was ready to go in terms of the money raised, we could start
> right now, and we'd have a good bit of time.  But all the money isn't raised.
> And the ability to raise that money, and the ability to pull people together is
> waiting on having the circumstances that will give us a high probability of
> success, as opposed to a lower probability.  And so, I'm not spending all my
> time right now working to get Montana ready, because I'm working to get
> other things ready where we do have a high probability of success.  And so,
> you know, right now, it's important that this litigation come to a conclusion
> for us to make the decision to invest the time to be ready to start the petition
> drive and complete it.[68]

---

[65] (Doc. 43-1 at 46-47.)
[66] See, (Doc. 50 at 13-14, ¶ 55.)
[67] See, (Doc. 43-1 at 106:2-12.)
[68] (Doc. 49 at 13-14) (citing Jacob Dep. at 74:14-75:13.)

In this matter, Plaintiffs have not been reasonably diligent. It was not the residency requirement that inhibited Plaintiffs' ability to place an initiative on the ballot, it was their own inaction. The Court must infer that the burden placed upon plaintiffs was not severe. Accordingly, there is no basis for this Court to apply strict scrutiny.

### ii.   Justifying State Interest

Because Plaintiffs failed to demonstrate the imposition of a severe burden, there is no need for Defendants to show that the statute is narrowly tailored, it only need be demonstrated that the rule at issue furthers an important regulatory interest. *Angle*, 1134-35, *Dudum*, 640 F. 3d at 1114. Although Plaintiffs have continue to characterize the widespread petition fraud and misconduct that occurred in 2006 as "an incident" or "one instance of petition fraud,"[69] they have also conceded that Montana has a compelling interest in protecting the integrity of its initiative process.[70]   Accordingly, the State's regulatory interest is sufficient to uphold the residency requirement of MCA §13-27-102(2)(a).

Moreover, the residency requirement is not prohibiting any of the Plaintiffs from communicating their views on the measures they seek to advance. They are certainly free to speak with Montana voters regarding the citizen voting initiative

---

[69] See e.g. (Doc. 49 at 7, 9) and (Doc. 52 at 9.)
[70] See e.g., (Doc. 49 at 8, 22).

24

or train Montana residents on best practices for signature gathering. "The one restriction is that out-of-state residents cannot personally collect and verify signatures, and that restriction is justified by the State's interest in preventing fraud." See, *Jaeger*, 241 F. 3d 614, 617 (8th Cir. 2001). Despite Plaintiffs' rather dismissive characterization, this requirement was put into place due to widespread fraud perpetrated by out of state actors.[71] Defendants will be granted summary judgment on claims I and II.

### D. Claims III & IV: First Amendment Challenge to Prohibition on Pay-Per-Signature

In *Prete v. Bradbury*, the Ninth Circuit rejected plaintiffs' challenge to an Oregon law, similar to Montana's, which "prohibited...payment to electoral petition signature gatherers on a...per signature basis. *Prete v. Bradbury*, 438 F. 3d 949, 951 (9th Cir. 2006). The District Court denied the First Amendment

---

[71] The state court found the evidence showed: "[I]t is a common practice in the professional signature gathering business to bring migrant signature gatherers, with no substantial ties to a state, in from out of state for the sole purpose of hustling up the necessary signature to qualify local ballot initiatives and then immediately move on to the next state without leaving a trace, thereby preventing any effective accountability or means to verify the integrity and regularity of the signature gathering process. There is also evidence that, while the out of state migrant signature gatherers are working in a state, it is a common industry practice for them to certify signatures gathered by other signature gatherers and to conceal, withhold, or misrepresent identifying and contact information...[u]nder the totality of the circumstances, it is more probable than not that this pattern and practice of fraud and procedural defect was prevalent throughout the statewide signature gathering process." (Sandefur Order)(Doc. 37-1 at 49-51).

challenge and the Ninth Circuit affirmed by applying the *Anderson-Burdick*

framework set forth above.  In relation to the first type of harm, the court

concluded it created a lesser burden, in part, because the declarations proffered by

the plaintiffs purporting to illustrate the difficulty of gathering signatures under the

law were based on "unsupported speculation," *id.* at 964-65, and a referendum

petition qualified for the ballot after the enactment of the law which had a

relatively low signature error rate. *Id.* at 966-67.  The court found the challenged

law was subject to "less exacting review," and held that Oregon's "important

regulatory interest in preventing fraud and its appearances in its electoral

processes" was sufficient to insulate the law from constitutional challenge. *Id.* at

969-71.

Defendants contend the holding of *Prete*, that restricting payment on a per-

signature-basis did not constitute a severe burden and the state asserted an

important regulatory interest in preventing fraud and forgery in the initiative

process, is controlling and that they are entitled to summary judgment.[72]

Plaintiffs seek to distinguish *Prete* arguing that unlike the incomplete factual

record developed by the *Prete* plaintiffs, they have developed an "undisputed and

unequivocal" record before this Court which demonstrates strict scrutiny applies

and that Montana's law is not narrowly tailored to advance a compelling state

---

[72] (Doc. 37 at 20-31) citing, *Prete*, 438 F. 3d at 963-66.

interest.[73]  In support of their argument, Plaintiffs rely primarily upon their own statement of undisputed facts.[74]

The Court finds here, much like above in relation to Plaintiffs' speculative claims surrounding the residency requirement, the record does not support setting aside *Prete* and/or finding that Montana's pay-per-signature ban constitutes a severe burden.  Under a relaxed level of scrutiny, the prohibition on pay-per-signature contained at MCA §13-27-102(2)(b) passes constitutional muster and finds support in Montana's interest in protecting the integrity of its ballot initiative process.

### i.    Burden on First Amendment Rights

Plaintiffs contend the pay-per-signature prohibition makes it unlikely that initiative proponents will gather the requisite number of signatures.  In support of this argument, Plaintiffs cite to the fact that Jacob and the Liberty Fund did not move forward with CI-117 when the prohibition was enjoined, in part because there was a concern they could not get enough signatures on the ballot.[75]  Likewise, citing the depositions of Jacob, Mooney, Hurst, and Pierce, Plaintiffs allege the pool of available and experienced circulators was reduced.  In support of this

---

[73] See, (Doc. 41 at 24-25.)
[74] *Id.*
[75] (Doc. 41 at 24)(citing Doc. 42 at ¶¶ 59, 60, 62)(referencing the depositions of Jacob, Mooney, Hurst, and Pierce); see also, (Doc. 49 at 20.)

27

contention, Plaintiffs point to the statement of Ferrell that she would have worked on the CI-117 petition circulation if there was no residency requirement or pay-per-signature prohibition in Montana.[76]  Plaintiffs assert both that the persons best able to convey their message will be eliminated and the size of the audience reached will necessarily be reduced.[77]  But as set forth above, with the exception of Pierce, none of the individuals Plaintiffs reference in support of these arguments have actually worked on Montana ballot initiatives.  Similar to the witnesses presented in *Prete*, this Court sees no basis to find that their assertions carry any more than "little weight."  *Prete*, 438 F. 3d at 965.

In support of its position, Plaintiffs cite to a statement from Pierce in which he described an incident where a woman being paid $15.00 per hour, was later discovered to be at home doing nothing.[78]  Plaintiffs cite to this example to support their contention that payment by the hour fails to adequately motivate people.[79]  Defendants respond that this single example, in Pierce's work since 2007 on more than 13 Montana ballot initiatives, is hardly sufficient to demonstrate the existence of a severe burden. The Court agrees.

---

[76] (Doc. 41 at 24)(citing Doc. 42 at ¶¶ 96, 138)(referencing depositions of Jacob, Mooney, Ferrell, Hurst, and Pierce); see also, (Doc. 49 at 20.)
[77] See, (Doc. 41 at 24)(citing Doc. 42 at ¶¶ 96, 139)(referencing Ferrell's statement re: working on CI-117, in addition to the depositions of Jacob, Mooney, Ferrell, Hurst, and Pierce)(Doc. 49 at 20-21).
[78] (Doc. 41 at 26).
[79] *Id.*

Finally, Plaintiffs point to the bids from Silver Bullet[80] and AMT[81] for the

CI-117 petition gathering, and the depositions of Jacob, Mooney, Pierce and

Hurst,[82] in support of their argument that the pay-per-signature prohibition

increases costs.

While the Court would note that the Silver Bullet bid is lower than the AMT

bid, Mooney testified under oath that the bid he provided was low.[83]  Because the

differential between the two amounts is unclear, the evidentiary value is limited.

The Court would also note that AMT specifically advised Jacob in its bid that it

"does not pay by the signature because it encourages fraud."[84]  The Court

presumes Jacob, in reaching out to AMT for the CI-117 bid, was seeking out

experienced circulators and those he deemed best for the job.  The fact that AMT

refuses to be compensated by the signature undercuts Plaintiffs' argument that only

the best and most experience circulators are paid per signature.

Moreover, Pearson opined, based upon his experience in Montana, that: (1)

paying signature gathers by the hour, as opposed to by the signature, is not a

barrier to a successful signature-gathering initiative campaign in Montana, (2)

paying signature gatherers by the hour is consistent with the underlying direct

---

[80] (Doc. 42-3.)
[81] (Doc. 42-4.)
[82] See, (Doc. 49 at 21.)
[83] See, (Doc. 43-1 at 98:20-24.)
[84] (Doc. 42-4 at 3.)

democracy process because it encourages discussion between Montanans

concerning the initiative at issue, and (3) paying signature gatherers by each

signature gathered encourages improper conduct because electors are viewed as

sources of money rather than as electors who will join as co-sponsors of an issue

that may be offered for consideration by all Montana electors.[85]  As established

above, Pearson also stated that since the passage of MCA §13-27-102(2)(b), there

have been many successful Montana initiatives using both paid and volunteer

signature gatherers.[86]

Defendants make a compelling argument that Plaintiffs' conclusory

allegations underscore the slight nature of the burden. For example, Defendants

point out that nothing in MCA §13-27-102(2)(b) requires hourly payment.

Initiative proponents are free to pay circulators: on a daily basis, a monthly basis,

by the job, by salary, or would be free to adjust salaries based upon a circulator

meeting certain benchmarks or validity rates.[87]  Jacob acknowledged that there was

no set way to compensate circulators and "you could bonus, you can do all kinds of

things, and you will do everything you can think of to get [circulators] more

focused on signatures."[88]  *Id.*  Likewise, Pierce noted there were "plenty of firms

---

[85] (Doc. 37-3 at 11.)
[86] See, (Doc. 37-3 at 10.)
[87] See, (Doc. 37 at 31).
[88] *Id.* at 32 (citing Jacob depo. at 82).

out of state who would definitely gather signatures on an hourly basis or on a contract basis" and Hurst concurred that even in states that allow pay-per-signature there are still firms that pay hourly.[89]  What is more, Jacob and Mooney apparently discussed the fact that Montana allows for compensation via bonus prior to Mooney providing Jacob with Silver Bullet's bid.[90]  Mooney acknowledged there are mechanisms to compensate circulators with bonuses to ensure performance, even if payment per signature is not allowed.[91]  This fact is neither referenced in Silver Bullet's bid, nor acknowledged in Plaintiffs' complaint.

Plaintiffs have failed to convince this Court that it should deviate from *Prete* or apply strict scrutiny.  While the diligence aspect of the *Anderson-Burdick* framework is not necessarily at play here, it is hard to find support for Plaintiffs' argument against the pay-per-signature prohibition when they did not even attempt to move forward with their initiatives.  Plaintiffs have failed to present evidence that the pay-per-signature prohibition significantly inhibited their ability to get an initiative on the ballot.  Their claim derives from little more than speculation; this is insufficient to support a finding of a severe burden.  See, *Prete*, 438 F. 3d at 964.

## ii.   Justifying State Interest

Again, Plaintiffs failed to demonstrate the imposition of a severe burden.

---

[89] *Id.*, (citing Pierce depo at 90; Hurst Depo. at 45).
[90] See, (Doc. 43-1 at 51:10-24).
[91] *Id.* at 53:1-12).

31

The Court would additionally note that prohibition on payment per signature contained at MCA §13-27-102(2)(b) was the Montana Legislature's response to the state court's finding of significant evidence showing "it [was] a common practice to pay migrant signature gatherers by the signature, thereby creating an incentive and profit motive to engage in deceptive, fraudulent, and procedurally irregular signature gathering practices." (Doc. 37-1 at 49-50.)

Because, as set forth above, Plaintiffs concede Montana has a compelling interest in protecting the integrity of its initiative process, this interest is sufficient to uphold the pay-per-signature prohibition of requirement of MCA §13-27-102(2)(b). Defendants will be granted summary judgment on claims III and IV.

## III.   Conclusion

The Court finds Plaintiffs have failed to show that Montana's prohibition on non-Montana residents circulating initiative petitions violates the rights guaranteed to them under the First and Fourteenth Amendments. Defendants are entitled to summary judgment on Claims I and II of the Amended Complaint as a matter of law. Further, the Court finds Plaintiffs have not demonstrated that Montana's prohibition on compensating circulators of initiative petitions based upon the number of signatures collected violates the rights guaranteed to them under the First and Fourteenth Amendments. Defendants are entitled to summary judgment on Claims III and IV of the Amended Complaint as a matter of law. Finally,

32

because Plaintiffs affirmatively abandoned Claims V, VI, and VII, of the Amended Complaint, Defendants are entitled to summary judgment on these claims as well.

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 36) is granted in full.  Defendants are granted summary judgment on Claims I, II, III, IV, V, VI, and VII of the Amended Petition.  Plaintiffs' Motion for Summary Judgment (Doc. 40) is DENIED in full.

The Clerk of Court is directed to enter judgment in accordance with this order, entering judgment for the defendants.

DATED this 4th day of December, 2020.

Charles C. Lovell
Senior United States District Judge

33